1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

STEVEN VIGGIANO, on behalf of          )   CASE NO. CV 12-10747 MMM (JCGx)
himself and all others similarly situated,  )
                                        )
              Plaintiff,                )   ORDER GRANTING DEFENDANTS'
                                        )   MOTION TO DISMISS
         vs.                            )
                                        )
HANSEN NATURAL CORPORATION;             )
HANSEN BEVERAGE COMPANY;                )
MONSTER BEVERAGE                        )
CORPORATION; and DOES 1 through         )
100, inclusive,                         )
                                        )
              Defendants.

On November 13, 2012, Steven Viggiano, on behalf of himself and all similarly situated

persons, filed a class action complaint in state court against Hansen Natural Corporation, and

various affiliated companies (collectively "Hansen").[1]  The action was removed to this court on

December 17, 2012.[2]  On January 25, 2013, Viggiano filed a first amended complaint.[3]  The

complaint pleads claims for violation of the Consumers Legal Remedies Act ("CLRA"), California

---

[1]Notice of Removal, Docket No. 1 (Dec. 17, 2012), Exh. 1 (Complaint).

[2]*Id.*

[3]First Amended Complaint ("FAC"), Docket No. 16 (Jan. 25, 2013).

Civil Code §§ 1750 et seq., the False Advertising Law ("FAL"), California Business & Professions Code §§ 17500 et seq., and the Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200 et seq. It also alleges various breach of warranty claims under state and federal law. Hansen moved to dismiss the first amended complaint on March 1, 2013.[4]  Viggiano opposes the motion.[5]

## I. BACKGROUND

Hansen is a company in the beverage industry.[6]  Among its products is a line of diet sodas – Diet Hansen's Premium Sodas.[7]  The sodas are sold in supermarkets and at other retail establishments throughout the United States.[8]  Hansen offers different flavors of the diet soda, such as creamy root beer, tangerine lime, and pomegranate.[9]  On the front of each can of diet soda is a label stating that the soda contains "all natural flavors;" this label also appears on the front of the box in which the diet soda is packaged.[10]  Each flavor of soda allegedly contains two synthetic ingredients, however: acesulfame potassium ("ace-k") and sucralose.[11]  These ingredients are purportedly artificial sweeteners and/or "flavor enhancers."[12]  Each soda also

---

[4]Motion to Dismiss ("Motion"), Docket No. 19 (Mar. 1, 2013); Reply in Support of Motion to Dismiss ("Reply"), Docket No. 27 (Apr. 29, 2013).

[5]Opposition to Motion to Dismiss ("Opp."), Docket No. 25 (Apr. 15, 2013).

[6]FAC, ¶¶ 3-7.

[7]Id., ¶ 12.

[8]Id., ¶ 1.

[9]Id., ¶¶ 12, 19.

[10]Id.

[11]Id., ¶¶ 13-14.

[12]Id., ¶ 14.

contains at least one natural fruit extract flavor.[13]

Viggiano has purchased several cans of Hansen's Diet Premium Sodas at a retail outlet store in Moorpark, California within the past four years.[14]  He alleges that the fact that the soda contains artificial ingredients makes the label claim "all natural flavors" false or misleading, as reasonable consumers would understand "natural flavors" to mean that the flavors have not been "modified, enhanced and/or supplemented with artificial and/or synthetic compounds."[15] Viggiano also asserts that naming the soda "Premium Diet Soda" denotes that the quality of the beverage is higher than competing diet sodas;[16] he contends this too implies that Hansen's diet sodas are flavored only with natural ingredients, not synthetic flavor enhancers.[17]  Plaintiff alleges that Hansen uses the "all natural flavors" labeling to mislead consumers and cause them to believe "that the ingredients that give the products their flavor are all natural," when in fact the flavors are supplemented by synthetic compounds.[18]  Viggiano contends he relied on Hansen's representations that the diet soda was "premium" and contained "all natural flavors," and inferred from them that the beverages contained no artificial sweeteners or flavor enhancers.[19]  He asserts that, had he known the truth, he would not have purchased the drink.[20]

Viggiano sues on his own behalf and on behalf of a nationwide class of persons who

---

[13]Request for Judicial Notice ("RJN"), Docket No. 20 (March 1, 2013), Exh. A-C.  The court addresses Hansen's request for judicial notice below.

[14]*Id.*, ¶ 2.

[15]*Id.*, ¶ 25.

[16]*Id.*, ¶ 28.

[17]*Id.*, ¶ 29.

[18]*Id.*, ¶ 33

[19]*Id.*, ¶ 35.

[20]*Id.*

purchased Hansen's Diet Premium Soda within the last four years.[21]  He also seeks to represent a sub-class of all California residents who purchased the soda within the past four years.[22]

## II.  DISCUSSION

### A.    Hansen's Request for Judicial Notice

Hansen asks that the court take judicial notice of three exhibits, each containing images of Hansen's diet soda packaging and individual cans.  The exhibits are images of the packaging for Hansen's diet tangerine lime soda;[23] the statement of ingredients on Hansen's diet creamy root beer cans;[24] and the statement of ingredients on Hansen's diet pomegranate can.[25]  Hansen asserts that Viggiano's complaint relies on the exhibits and that their authenticity is unchallenged.[26]

In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto.  *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).  It may, however, consider documents that are incorporated by reference but not physically attached to the complaint if they are central to plaintiffs' claim and no party questions their authenticity.  See *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (in ruling on a motion to dismiss for failure to state a claim "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion," citing *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994),

---

[21]*Id.*, ¶ 40.

[22]*Id.*

[23]*Id.*, Exh. A.

[24]*Id.*, Exh. B.

[25]*Id.*, Exh. C.

[26]*Id.* at 1-2.

4

overruled on other grounds, *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002)); *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n. 5 (9th Cir. 2003); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 n. 3 (2d Cir. 2002)); see also *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007) ("Review is generally limited to the contents of the complaint, but a court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document," citing *Warren*, 328 F.3d at 1141 n. 5); *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) ("If the documents are not physically attached to the complaint, they may be considered if the documents' 'authenticity . . . is not contested' and 'the plaintiff's complaint necessarily relies' on them," citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998)); *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999) ("[The incorporation by reference doctrine] permits a district court to consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiffs'] pleading,'" quoting *Branch*, 14 F.3d at 454).

Viggiano references the statement of ingredients on both Hansen diet soda cans and packaging several times in the complaint.[27]  In fact, he has included various images of Hansen diet soda cans and the packaging in his complaint.[28]  Viggiano does not dispute the accuracy of the exhibits Hansen seeks to have the court review.  The court will therefore consider the documents under the incorporation by reference doctrine.

## B.   Legal Standard Governing Motions to Dismiss under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Department*, 901 F.2d 696, 699 (9th Cir. 1988).  In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto.  *Van*

---

[27]See, e.g., FAC, ¶¶ 12, 13, 21, 22

[28]*Id.*, ¶ 12.

1  *Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc.*

2  *v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990).

3      The court must accept all factual allegations pleaded in the complaint as true, and construe

4  them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v.*

5  *Liberty Mutual Insurance Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747,

6  750 (9th Cir. 1995). It need not, however, accept as true unreasonable inferences or legal

7  conclusions cast in the form of factual allegations. See *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct.

8  1937, 1949 (2009) ("[B]are assertions . . . amount[ing] to nothing more than a 'formulaic

9  recitation of the elements' of a constitutional discrimination claim" are not entitled to an

10  assumption of truth, quoting *Bell Atlantic Corp. v. Twombly*, 50 U.S. 544, 555 (2007)); see also

11  *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("Such allegations are not to be

12  discounted because they are 'unrealistic or nonsensical,' but rather because they do nothing more

13  than state a legal conclusion – even if that conclusion is cast in the form of a factual allegation").

14      To survive a motion to dismiss, plaintiff's complaint must "contain sufficient factual

15  matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has

16  facial plausibility when the plaintiff pleads factual content that allows the court to draw the

17  reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at

18  1949. See also *id.* ("The plausibility standard is not akin to a 'probability requirement,' but it asks

19  for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint

20  pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line

21  between possibility and plausibility of "entitlement to relief,"'" quoting *Twombly*, 550 U.S. at

22  557); *Twombly*, 550 U.S. at 545 ("While a complaint attacked by a Rule 12(b)(6) motion to

23  dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds'

24  of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation

25  of the elements of a cause of action will not do. Factual allegations must be enough to raise a

26  right to relief above the speculative level, on the assumption that all the allegations in the

27  complaint are true (even if doubtful in fact)" (citations omitted)). See also, e.g., *Moss*, 572 F.3d

28  at 969 ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,'

and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

**C.   Viggiano's Unfair Competition, Consumer Legal Remedies Act, and False Advertising Claims**

**1.   Legal Standard Governing UCL Claims**

Under the UCL, any person or entity that has engaged, is engaging, or threatens to engage "in unfair competition may be enjoined in any court of competent jurisdiction." CAL. BUS. & PROF. CODE §§ 17201, 17203. "Unfair competition" includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." *Id.*, § 17200. The California Supreme Court has construed the term broadly. See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.4th 163, 180 (1999) ("[Section 17200] defines 'unfair competition to include any unlawful, unfair or fraudulent business act or practice. . . . Its coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law. . . . By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable. . . . However, the law does more than just borrow. The statutory language referring to any unlawful, unfair or fraudulent practice . . . makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition – acts or practices which are unlawful, or unfair, or fraudulent" (internal quotations omitted)); see also *Paulus v. Bob Lynch Ford, Inc.*, 139 Cal.App.4th 659, 676-77 (2006) ("The purpose of the UCL 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. . . .' Thus, the scope of the UCL (Bus. & Prof. Code, § 17200 et seq.) is 'broad.' It 'covers a wide range of conduct'" (citations and footnote omitted)).

**2.   Legal Standard Governing CLRA Claims**

The CLRA makes illegal various "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in

the sale or lease of goods or services to any consumer." CAL. CIV. CODE § 1770(a).  Conduct that is "likely to mislead a reasonable consumer" violates the CLRA.  *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663, 680 (2006) (quoting *Nagel v. Twin Laboratories, Inc.*, 109 Cal.App.4th 39, 54 (2003)).  A "reasonable consumer" is an "ordinary consumer acting reasonably under the circumstances," who "is not versed in the art of inspecting and judging a product, [or] in the process of its preparation or manufacture. . . ." *Id.* (citing 1A CALLMANN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 5:17 (4th ed. 2004)).

Section 1770(a)(4) bans the use of "deceptive representations or designations of geographic origin in connection with goods or services," while § 1770(a)(5) prohibits "[r]epresenting that goods or services have . . . characteristics, ingredients, uses, benefits, or quantities which they do not have. . . ."  In addition, § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," and § 1770(a)(16) bans "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not."  The CLRA is to be "liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." *Colgan*, 135 Cal.App.4th at 680.

### 3.    Legal Standard Governing FAL Claims

California's FAL prohibits the dissemination of false or misleading statements in connection with advertising.  CAL. BUS. & PROF. CODE § 17500.[29]  "Section 17500 has been

---

[29]Section 17500 provides: "It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known,

broadly construed to proscribe 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'" *Colgan*, 135 Cal.App.4th at 679 (quoting *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 951 (2002) (internal quotation marks omitted)). In evaluating whether a statement is misleading, the court looks primarily to the words of the statement itself, and compares those words to the actual facts. *Id.* A court may award injunctive relief and restitution for false advertising that violates § 17500. See *id.*, § 17535. A violation of the FAL also constitutes a violation of the UCL. *Kasky*, 27 Cal.4th at 949-50; see also *Pfizer Inc. v. Superior Court*, 182 Cal.App.4th 622, 630 n. 4 (2010).[30]

---

to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised. Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both that imprisonment and fine." CAL. BUS. & PROF. CODE § 17500.

[30]An individual can sue as a "private attorney general" only if he has suffered injury as a result of an allegedly unfair business practice. See CAL. BUS. & PROF. CODE § 17535 ("Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of this section. . ."); *id.*, § 17204 ("Actions for any relief pursuant to this chapter shall be prosecuted[,] [*inter alia*,] . . . by any person who has suffered injury in fact and has lost money or property as a result of such unfair competition"); see also *Paulus*, 139 Cal.App.4th at 677 n. 13 ("Proposition 64's provisions . . . chang[ed] the language of the [UCL] to read that a person could bring suit only if the person 'has suffered injury in fact and has lost money or property as a result of such unfair competition.' . ."); *Harris v. Investor's Business Daily, Inc.*, 138 Cal.App.4th 28, 33 (2006) (California Business and Professions Code § 17203 "now requires that relief may be sought only by persons who have themselves suffered injury"); *Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal.App.4th 997, 1010 (2005) (stating that the Proposition 64 amendments "limit private representative actions to persons who . . . meet the standing requirements set forth in section 17204, which include injury in fact").

Where UCL and FAL claims are premised on allegedly misleading communications, California courts require evidence of reliance before they will find that causation and "injury in fact" have been proved. See *In re Tobacco II Cases*, 46 Cal.4th 298, 326 (2009) (holding that a consumer suing a business under the "fraud" prong of the UCL must show actual reliance on an alleged misrepresentation, not merely a factual nexus between the business's conduct and the consumer's injury); *Pfizer Inc.*, 182 Cal.App.4th at 630 (analyzing the impact of Proposition 64

### 4.   Whether Viggiano's Claims are Preempted

Viggiano's claims are based on a contention that the labeling on Hansen Premium Diet Soda is false and misleading because "reasonable consumers[ ] would understand the term 'natural' to mean that none of the flavorings are synthetic and/or artificial and/or modified, enhanced and/or supplemented with artificial and/or synthetic compounds."[31]  Hansen argues that these claims are preempted by federal law.

The Supremacy Clause of the United States Constitution empowers Congress to enact legislation that preempts state law.  See *Gibbons v. Ogden*, 22 U.S. 1, 82 (1824) ("In every such case, the act of Congress, or the treaty, is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it"); *Law v. General Motors Corp.*, 114 F.3d 908, 909 (9th Cir. 1997) ("The Supremacy Clause empowers Congress to supplant decentralized, state-by-state regulation with uniform national rules").  "Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field."  *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010) (quoting *Tocher v. City of Santa Ana*, 219 F.3d 1040, 1045 (9th Cir. 2000), abrogated on other grounds by *City of Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424 (2002)).

In assessing whether Viggiano's claims are preempted, the court is mindful of the presumption against preemption.  See *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("In all preemption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and

---

on UCL claims and noting that a plaintiff "proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate *actual reliance* on the allegedly deceptive or misleading statements, in accordance with well-settled principles regarding the element of reliance in ordinary fraud actions").

[31]FAC, ¶ 25.

10

manifest purpose of Congress'"); see also *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005) ("[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly preempt state-law causes of action"); *Law*, 114 F.3d at 909-10 ("Given the importance of federalism in our constitutional structure, however, we entertain a strong presumption that federal statutes do not preempt state laws; particularly those laws directed at subjects – like health and safety – 'traditionally governed' by the states. 'Thus, pre-emption will not lie unless it is the clear and manifest purpose of Congress'" (citations omitted)); see also *In re Farm Raised Salmon Cases*, 42 Cal.4th 1077, 1088 (2008) (noting that consumer protection laws such as the UCL, false advertising law and CLRA, are within the states' historic police powers and therefore subject to the presumption against preemption). Where Congress has expressly preempted state law, the presumption against preemption requires that the court read the federal statute narrowly. See *Medtronic, Inc.*, 518 U.S. at 485 (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 518 (1992)).

The Federal Food, Drug and Cosmetic Act ("FDCA") was enacted in 1938 as a successor to the 1906 Pure Food and Drugs Act, the first comprehensive federal legislation designed to protect consumers from fraud or misrepresentation in the sale of food and drugs. See James T. O'Reilly, Food and Drug Administration § 3:1-13 (3d ed. 2009). The FDCA empowers the FDA (a) to protect public health by ensuring that "foods are safe, wholesome, sanitary, and properly labeled," 21 U.S.C. § 393(b)(2)(A); (b) to promulgate regulations implementing the statute; and (c) to enforce its regulations through administrative proceedings. See 21 C.F.R. § 7.1 et seq. The FDCA deems a food "misbranded" if its labeling "is false or misleading in any particular." 21 U.S.C. § 343(a).[32]

---

[32]There is no private right of action under the FDCA. See *PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 924 (9th Cir. 2010) (noting that "the FDCA forbids private rights of action under that statute "). See also *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 810-11 (1986) ("In this case, both parties agree with the Court of Appeals' conclusion that there is no federal cause of action for FDCA violations. For purposes of our decision, we assume that this is a correct interpretation of the FDCA. . . . In short, Congress did not intend a private federal remedy for violations of the statute that it enacted); *Utley v. Varian Associates, Inc.*, 811 F.2d

In 1990, Congress amended the FDCA by enacting the Nutrition Labeling and Education Act ("NLEA") "to 'clarify and to strengthen the Food and Drug Administration's legal authority to require nutrition labeling on foods, and to establish the circumstances under which claims may be made about the nutrients in foods.'" *Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 223 (2d Cir. 1998) (citing H.R. Rep. No. 101-538, at 7 (1990)).   "The NLEA amended the FDCA in several significant respects: it expanded the coverage of nutrition labeling requirements; it changed the form and substance of ingredient labeling on packages; it imposed limitations on health claims; it standardized the definitions of all nutrient content claims; and it required more uniform serving sizes." *Ackerman v. Coca-Cola Co.*, No. CV-09-0395 (JG)(RML), 2010 WL 2925955, *3 (E.D.N.Y. July 21, 2010) (citing *The Impact of the Nutrition Labeling and Education Act of 1990 on the Food Industry*, 47 ADMIN.L.REV. 605, 606 (1995)).   The NLEA also added an express preemption provision to the FDCA.  See 21 U.S.C. § 343-1(a)(5) ("Except as provided in subsection (b), no State or political subdivision of a State may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce . . . (3) any requirement for the labeling of food of the type required by section . . . 343(k) of this title that is not identical to the requirement of such section").

Section 343(k) governs claims on food labels that concern "[a]rtificial flavoring, artificial coloring, or chemical preservatives."  21 U.S.C. § 343(k).  Pursuant to this statute, the FDA has promulgated regulations that expressly govern the use of a "natural flavor" label.  21 C.F.R. § 101.22(i)(1) provides that a manufacturer can use a "natural flavor" label on a product even if the product contains artificial, non-flavoring ingredients, so long as the "characterizing flavor" is, in fact, natural.  See *Lam v. General Mills, Inc.*, 859 F.Supp.2d 1097, 1103 (N.D. Cal. 2012) ("So long as that product 'contains natural flavor' which is 'derived from' the 'characterizing food

---

1279, 1282 (9th Cir. 1987) ("The Court, in rejecting the district court's reasoning and holding that it did not have removal jurisdiction, found that the lack of a private right of action under the FDCA disposed of the issue of whether a state claim based on its violation arose under federal law," citing *Merrell Dow Pharmaceuticals*, 478 U.S. 804).

ingredient,' it will not run afoul of the regulation").[33]  21 C.F.R. § 101.22(a)(3) defines "natural flavor or natural flavoring" as "the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any products of roasting, heating or enzymolysis, which contains the flavoring constituents derived from [fruit or fruit juice]."

By contrast, under 21 C.F.R. § 101.22(i)(2), if a product contains "any *artificial* flavor which simulates, resembles or reinforces the characterizing flavor . . . the name of the characterizing flavor shall be accompanied by the words 'artificial' or 'artificially flavored'" (emphasis added).  The FDA defines "artificial flavor" as:

> "[A]ny substance, the function of which is to impart flavor, which is not derived
> from a [natural product]. . . .  Artificial flavor includes the substances listed in
> §§ 172.515(b) and 182.60 of this chapter except where these are derived from
> natural sources."  21 C.F.R. § 101.22(a)(1).

The question is whether § 343-1(a)(5), which prohibits states from establishing any "requirement" that is "not identical" to the requirements of 21 U.S.C. § 343(k), expressly preempts Viggiano's UCL, CLRA, and FAL claims to the extent they allege that Hansen's "all natural flavors" label is false or misleading.  Other courts addressing this issue have dismissed claims under California's consumer protection laws on preemption grounds.  These courts have differentiated between unnatural *ingredients* and unnatural *flavors*, finding that FDA regulations permit a food product to be labeled as containing "natural flavors" even if the ingredients themselves are not all natural.  See *Lam*, 859 F.Supp.2d at 1102-03 ("Lam also argues that the 'fruit flavored' and 'naturally flavored' labels are false and misleading because the Fruit Snacks

---

[33]Section 101.22(i) states: "If the label, labeling, or advertising of a food makes any direct or indirect representations with respect to the primary recognizable flavor(s), by word, vignette, e.g., depiction of a fruit, or other means, or if for any other reason the manufacturer or distributor of a food wishes to designate the type of flavor in the food other than through the statement of ingredients, such flavor shall be considered the characterizing flavor and shall be declared in the following way: . . . If the food contains no artificial flavor which simulates, resembles or reinforces the characterizing flavor, the name of the food on the principal display panel or panels of the label shall be accompanied by the common or usual name of the characterizing flavor, e.g., 'vanilla,' in letters not less than one-half the height of the letters used in the name of the food."

1  are flavored with 'unnatural, non-fruit ingredients.' . . .  The crux of the FAC is that the Fruit

2  Snacks' labeling is deceptive because the products' ingredients, not their flavors, are unnatural.

3  However, under 21 C.F.R. § 101.22(i), a product may be labeled as 'fruit flavored' or 'naturally

4  flavored,' even if it does not contain fruit or natural ingredients.  So long as that product 'contains

5  natural flavor' which is 'derived from' the 'characterizing food ingredient,' it will not run afoul

6  of the regulation. . . .  Accordingly, her claims concerning the flavoring labels are preempted by

7  the FDCA"); *Ivie v. Kraft Foods Global, Inc.*, No. C–12–02554–RMW, 2013 WL 685372, *9

8  (N.D. Cal. Feb. 25, 2013) ("[D]efendants' 'natural flavor' labels appear to be in compliance with

9  21 C.F.R. § 101.22(i)(1) because, as defendants[ ] assert and plaintiff does not dispute in the

10  opposition brief, the purchased Crystal Light Products contain a natural characterizing flavor

11  derived from lemon. . . .  Because there is no dispute here that the lemon flavor in the Crystal

12  Light product is a natural flavor under the regulations, the natural lemon flavor labels are in

13  compliance with FDA regulation.  Like in *Lam*, plaintiff's claims concerning the 'natural lemon

14  flavor' labels are preempted by the FDCA").

15       Hansen's soda cans refer specifically to natural *flavors*, not natural ingredients.  Viggiano

16  does not identify any flavors in the sodas that are not natural or artificial; rather, the synthetic

17  ingredients he cites in the complaint – ace-K and sucralose – are artificial sweeteners or "flavor

18  enhancers."  Under FDA regulations, sucralose "may be used as a sweetener in foods generally."

19  21 C.F.R. § 172.831.  Similarly, ace-k "may be safely used as a general-purpose sweetener and

20  flavor enhancer in foods generally."   21 C.F.R. § 172.800.   A "flavor enhancer" is a

21  "[s]ubstance[ ] added to supplement, enhance, or modify the original taste and/or aroma of a food,

22  *without imparting a characteristic taste or aroma of its own*."   21 C.F.R. § 170.3(o)(11)

23  (emphasis added).  By definition, therefore, neither sucralose nor ace-k are "flavors," as they do

24  not give the product an original taste – rather, they sweeten or amplify whatever characterizing

25  flavor it has from another source.  Also, and perhaps most significantly, neither substance appears

26  on the lists of artificial flavors promulgated by the FDA.  See 21 C.F.R. §§ 172.515(b), 182.60.

27  Accordingly, neither sucralose nor ace-k is a "flavor."  Thus, the fact that they are allegedly

28  unnatural does not render Hansen's "all natural flavors" label false or misleading under FDA

guidelines.

The case is thus squarely in line with *Lam*.  As in *Lam*, the labeling here is expressly permitted by FDA regulations.  The statement of ingredients on the soda can clearly states that the product's flavor is derived from extracts of natural fruits; this qualifies as "natural" under 21 C.F.R. § 101.22(a)(3).[34]  As FDA regulations explicitly authorized Hansen to label the product as it did, any state law requiring Hansen to use additional or different labeling would not be at identical to FDA regulations and would be preempted by the FDCA.  See *Lam*, 859 F.Supp.2d at  1103 ("Lam points to a number of cases concerning the use of the labels 'natural' and 'all natural' to describe a product's ingredients.  These cases are inapposite since they deal with the labeling of a product's ingredients, not the labeling of its flavors.  Here, the labeling challenged by Lam – which is related to the Fruit Snacks flavor – is expressly permitted by FDA regulations. . . .  For these reasons, the Court finds that Lam's claims are preempted to the extent they are predicated on the 'naturally flavored' and 'fruit flavored' labels").[35]

_____

[34]RJN, Exh. A (statement of ingredients for Hansen's diet tangerine lime soda listing "natural fruit flavors with extracts of California tangerines and Florida and/or Colima limes").

[35]Viggiano attempts to distinguish cases such as *Lam*, where specific flavors were identified as natural, noting that Hansen's label states that *all* flavors are natural.  The court is not persuaded.  The FDCA and FDA regulations bar states from requiring any additional labels "of the type" required by the federal regulations; the regulations clearly address labeling related to a product's flavor, whether the label refers to some *or* all of the product's flavors.  The fact that a "natural flavors" label references "all flavors" rather than a specific flavor does not remove it from the sphere of activity regulated by the FDA and preempted by the FDCA.  See *Astiana v. Dreyer's Grand Ice Cream, Inc.*, Nos. C–11–2910 EMC, 2012 WL 2990766, *6 (N.D. Cal. July 20, 2012) ("To the extent Plaintiffs suggest DGIC's argument [regarding preemption] has no viability because DGIC used the term 'All Natural Flavors' on the label as opposed to 'natural flavors' alone, the Court does not agree.  Section 341–1(a)(3) bars a state from imposing any requirement for the labeling of food 'of the *type* required by [§ 343(k)].'  The statute does not require exact precision" (emphasis original)).  As discussed in detail *infra*, the"all natural flavors" label on the front of the can is consistent with the statement of ingredients on the back; the statement of ingredients provides greater detail concerning the flavors in the soda.  Furthermore, each can bears the name of a fruit and images of the fruit from which the natural flavor is derived. It is apparent that Hansen uses "all natural flavors" as uniform nomenclature on all flavors of its diet soda.  The specific source of the flavor is then identified on the statement of ingredients. Thus, the fact that Hansen uses the term "all" on the front label, rather than specifying the specific

1    Viggiano disputes this, arguing that *Astiana*, not *Lam*, reflects the correct outcome here.
2    There, the court concluded that the FDCA did not preempt state law consumer claims that alleged
3    an "all natural flavors" label on an ice cream box was misleading. *Id.* at *7. Astiana argued that
4    the label was misleading because "a reasonable consumer could interpret 'All Natural Flavors' to
5    mean 'all natural ingredients.'" *Id.* Noting that the defendant relied on an inapplicable statute,
6    21 U.S.C. § 343(r), which governs labels setting forth nutritional levels, the court found the claim
7    was not preempted. *Id.* Comparing a label that sets forth nutritional levels with a claim that a
8    product has "All Natural Flavors," the *Astiana* court observed that there is generally "no real
9    room for debate" about the accuracy of nutritional level claims, while, by contrast, the phrase "All
10   Natural Flavors" is "plausibly subject to some interpretation – i.e., what is the meaning of
11   'flavors'?" *Id.* While the court expressed skepticism that labeling a product "all natural flavors"
12   communicated that it contained "all natural ingredients," it ultimately declined to dismiss the claim
13   because, at the pleadings stage, plaintiff's interpretation of the phrase was plausible. *Id.* The
14   court does not appear to have considered the impact of § 343(k) or the regulations implementing
15   it, which govern manufacturer's claims concerning natural or artificial flavors.[36] Given the clear,
16   specific regulations promulgated by the FDA concerning the use of "natural flavors," the court
17   respectfully disagrees with the *Astiana* court insofar as its analysis can be read to apply to the facts
18   alleged here. It is clear from the regulations that ace-k and sucralose are *not* flavors; rather, they
19   are sweeteners and/or flavor enhancers. They do not impart a taste to the diet soda, and they do
20   not appear on the FDA's list of artificial flavors. While the distinction between an enhanced
21   natural flavor and an unenhanced natural flavor may be one with which normal consumers are not
22   familiar, the FDA has not precluded food manufacturers from labeling their products naturally

23   _____

24   flavor of the beverage in the can, does not change the court's analysis.

25   [36]*Astiana* also addressed additional regulations not at issue here: 21 C.F.R. § 101.22(h),
26   which details how a flavor can be described in a statement of ingredients, and § 135.110(f)(2),
     which governs labeling of flavors for ice cream products. The label being challenged in this case
     is not part of the statement of ingredients, but is found on the front of the soda can and packaging;
27   § 101.22(h), therefore, does not apply. Similarly, as Hansen's product is a beverage, not ice
28   cream, § 135.110 does not apply.

flavored simply because the flavor may be artificially enhanced.          The "all natural flavors" label that Viggiano challenges does not identify the specific characterizing flavor of the soda; thus, 21 C.F.R. § 101.22(i) is not directly relevant.  The court notes, however, that the overall labeling of the product appears to comply with this regulation.  The specific flavor of the soda and images of the fruit that provides that flavor appear near the "all natural flavors" label on both the packaging and product can.[37]  It is therefore readily apparent from the context the specific, characteristic flavor to which the label makes reference, bringing the label under § 101.22(i).  See *Dvora v. General Mills*, No. CV 11–1074–GW, 2011 WL 1897349, *5 (C.D. Cal. May 16, 2011) (noting that under § 101.22(i), "food may be labeled 'natural flavored' when some flavor is 'derived from' the fruit identified as the characterizing flavor," and construing references on packaging to blueberry and pomegranate as identifications of the characterizing flavor of the food).

Courts have repeatedly found that state law claims challenging "natural flavors" labels, accompanied by images or names of fruit, are preempted, because such labeling references the characterizing flavor of the food and is permitted by § 101.22.  See *McKinnis v. Kellogg USA*, No. CV 07-2611 ABC (RCx), 2007 WL 4766060, *4 (C.D. Cal. Sept. 19, 2007) ("FDA regulations permit illustrations of fruit on product labels to indicate that product's 'characterizing flavor,' even where the product contains no ingredients derived from the depicted fruit.  Froot Loops contains the 'NATURAL FRUIT FLAVORS' of lime, orange, lemon, cherry, raspberry, and blueberry, as disclosed in the ingredients panel, rendering any depiction of fruit 'vignettes' on the box entirely accurate and permissible under FDA regulations"); *McKinniss v. General Mills, Inc.*,  No. CV 07-2521 GAF, 2007 WL 4762172, *3 (C.D. Cal. Sept. 18, 2007) ("The FDA permits illustrations of fruit on product labels to indicate the product's 'characterizing flavor.' . . .  Similarly, the words 'Natural Fruit Flavors' indicate the product's 'characterizing flavor,' not the presence of actual fruit"); *McKinniss v. Sunny Delight Beverages Co.*, No. CV

---

[37]See FAC, ¶ 12 (both the packaging and the soda can contain images of tangerines and limes directly above "all natural flavors").

07-02034-RGK (JCx), 2007 WL 4766525, *4 (C.D. Cal. Sept. 4, 2007) ("FDA regulations permit illustrations of fruit on product labels to indicate that product's 'characterizing flavor,' even where the product contains no ingredients derived from the depicted fruit," citing 21 C.F.R. § 101.22(i)(1) (i-iii)).  Furthermore, the natural fruit from which the characterizing flavor is derived is listed on the statement of ingredients, and "reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging." *Williams v. Gerber Products Co.*, 552 F.3d 934, 939-40 (9th Cir. 2008).  Here, the general "all natural flavors" label is confirmed by looking to the statement of ingredients, which identifies the specific, natural, characterizing flavor for that can.

In short, Hansen's labeling of its diet soda conforms to FDA reguations, and any state law that requires different or additional labeling is preempted.  Accordingly, Viggiano's UCL, FAL, and CLRA claims are dismissed.[38]

---

[38]Even were the court to consider the merits of the claims, dismissal would be appropriate. Each of the UCL, FAL and CLRA employs "the 'reasonable consumer' standard" in determining whether a statement or representation is likely to deceive.  *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal.App.4th 663, 680 (2006) ("Conduct that is 'likely to mislead a reasonable consumer' thus violates the CLRA"); *id.* at 682 ("To prevail on a false advertising claim [under the FAL], a plaintiff need only show that members of the public are likely to be deceived.  A 'reasonable consumer' standard applies when determining whether a given claim is misleading or deceptive. A 'reasonable consumer' is 'the ordinary consumer acting reasonably under the circumstances,' and 'is not versed in the art of inspecting and judging a product, in the process of its preparation or manufacture,'" quoting 1A CALLMANN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES (4th ed. 2004), § 5:17, p. 5-103 (internal citations omitted)).  See also *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995)("In order to obtain a remedy for deceptive advertising, a UCL plaintiff need only establish that members of the public were likely to be deceived by the advertising. . . .  The law focuses on a reasonable consumer who is a member of the target population."  This standard requires that plaintiffs "show that 'members of the public are likely to be deceived,'" quoting *Bank of West v. Superior Court*, 2 Cal.4th 1254, 1267 (1992)).

The label "all natural flavors" is consistent with the statement of ingredients on the soda can; as discussed, "flavors" is distinct from "ingredients," and Viggiano has identified no artificial *flavors* in the drink.  In cases where a product's front label is accurate and consistent with the statement of ingredients, courts routinely hold that no reasonable consumer could be misled by the label, because a review of the statement of ingredients makes the composition of the food or drink clear.  *Hairston v. South Beach Beverage Co., Inc.*, No. CV 12–1429–JFW, 2012 WL

### D.    Claims Under California's Breach of Warranty Laws

In addition to state consumer protection claims, Viggiano pleads various breach of warranty claims.  He asserts claims for breach of express warranty, breach of the implied warranties of merchantability and fitness for a particular purpose, and breach of warranty under the Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301.  The court addresses each claim in turn.

### 1.    Breach of Express Warranty

California Commercial Code § 2313, which defines express warranty, applies to "transactions in goods."  See CAL. COM. CODE § 2102; see also CAL. CIV. CODE § 1791.2(a)(1) (defining an "express warranty" as "[a] written statement arising out of a sale to the consumer of a consumer good pursuant to which the manufacturer, distributor, or retailer undertakes to

---

1893818, *5 (C.D. Cal. May 18, 2012) ("[T]he ingredient list is consistent with the front label statement of 'all natural with vitamins.' The ingredient list is also consistent with the statement 'nutrient enhanced hydration beverage,' the fact that Lifewater is a flavored water beverage and not a juice, and with the product name '0 Calorie Lifewater'. . . .   Accordingly the Court concludes that . . . the 'all natural' language on Defendants' Lifewater is not deceptive as a matter of law"); *Sunny Delight*, 2007 WL 4766525 at *4 ("A reasonable consumer who makes even a cursory review of the product labels at issue here would find not only the precise fruit content of Defendant's products, but also that Defendant's products are fruit 'flavored' and contain minimal quantities of concentrated fruit juice"); *General Mills*, 2007 WL 4762172 at *3 ("A reasonable consumer would . . . be expected to peruse the product's contents simply by reading the side of the box containing the ingredient list").  As there are no artificial flavors in Hansen's diet soda, as reflected on the statement of ingredients, labeling the product "all natural flavors" is not misleading as a matter of law.

Finally, the fact that the soda is clearly labeled "diet" indicates to consumers that it contains artificial sweeteners; it is the lack of real sugar that renders a soda "diet."  Diet sodas are ubiquitous in the United States, and a reasonable consumer would understand that a diet soda – even one with a label stating that it has "all natural flavors" – contains artificial sweeteners.  See *Nutrasweet Co. v. Venrod Corp.*, 982 F.Supp. 98, 103 (D. P.R. 1997) (noting that "NutraSweet[ is] the most popular diet sweetener on the market," that it is used "mostly for diet soda," and that it thus has "strong brand recognition"); cf. *Werbel ex rel. v. Pepsico, Inc.*, No. C 09–04456 SBA, 2010 WL 2673860, *4 (N.D. Cal. July 2, 2010) ("It is obvious from the product packaging that no reasonable consumer would believe that Cap'n Crunch derives any nutritional value from berries. As an initial matter, the term 'Berries' is not used alone, but always is preceded by the word 'Crunch,' to form the term, 'Crunch Berries').  Accordingly, the court concludes that, read in conjunction with the ingredients list, the "all natural flavors" label would not confuse a reasonable consumer.

1   preserve or maintain the utility or performance of the consumer good or to provide compensation

2   if there is a failure in utility or performance"); BLACK'S LAW DICTIONARY at 1582 (7th ed. 1999)

3   (defining "express warranty" as "[a] warranty created by the overt words or actions of the

4   *seller*"); 3 B.E. Witkin, SUMMARY OF CALIFORNIA LAW, §§ 55-56 (9th ed. 1990); Richard A.

5   Lord, WILLISTON ON CONTRACTS 4TH § 52.45 (4th ed. 2004) ("Under the [Uniform Commercial]

6   Code, an express warranty is usually associated with a contract for the sale of goods, but may be

7   found in connection with other transactions involving goods. . . . There is a division of opinion

8   whether the express warranty concepts in the Code are also applicable or may be extended to

9   service agreements").

10      To prevail on a breach of express warranty claim, a plaintiff must prove that the seller

11   "(1) made an affirmation of fact or promise or provided a description of its goods; (2) the promise

12   or description formed part of the basis of the bargain; (3) the express warranty was breached; and

13   (4) the breach caused injury to the plaintiff." *Rodarte v. Philip Morris, Inc.*, No. 03-0353FMC,

14   2003 WL 23341208, *7 (C.D. Cal. June 23, 2003). A description of the goods at issue can create

15   an express warranty so long as it was part of the basis of the bargain between the parties. See

16   CAL. COM. CODE § 2313(l)(b).

17      Each of Viggiano's first and seventh causes of action pleads a breach of express warranty

18   claim. The court can discern no difference between the two claims, and thus addresses them

19   together. Viggiano alleges that Hansen affirmatively represented that its diet soda was "premium"

20   and contained "all natural flavors."[39] As respects Viggiano's allegation that Hansen warranted

21   that the beverage contained "all natural flavors," the court reiterates that this accurately describes

22   the product. Viggiano does not identify any artificial flavor in the drink, and the images of the

23   soda can and packaging included in the complaint clearly identify the natural flavor found in each

24   type of soda. As a consequence, Viggiano has failed adequately to allege that Hansen breached

25   an express warranty that the drink contained all natural flavors. See *Kellogg USA*, 2007 WL

26   4766060 at *5 ("[T]he Froot Loops box contains no misrepresentations that the cereal contains

27   _____

28   [39]FAC, ¶ 50.

fruit; at most, Defendant represented that the cereal contains 'NATURAL FRUIT FLAVORS' of lime orange, lemon, cherry, blueberry, and raspberry, which, upon a cursory glance at the nutrition information printed on the box, is an entirely accurate statement.  Absent a representation that Froot Loops contains actual fruit, Plaintiffs have failed to allege sufficient facts to make out a claim for breach of an express warranty, and their Fourth Cause of Action is therefore dismissed"); *Sunny Delight*, 2007 WL 4766525 at *6 ("Assuming, arguendo, that the depictions of fruit do constitute affirmations of fact or promises regarding the fruit content of Defendant's products, there has been no breach of those promises.  Defendant's products do contain concentrated fruit juice from each of the fruits depicted on the labels in quantities that are disclosed on the back of those labels.  In short, Plaintiffs have failed to allege sufficient facts to make out a claim for breach of an express warranty, and their Fourth Cause of Action is therefore dismissed with prejudice").  To the extent Viggiano's claim is based on the alleged express warranty that the soda contains "all natural flavors," therefore, it must be dismissed.

Viggiano also alleges that Hansen's statement that the beverage is a "premium soda" is a warranty that has been breached because the soda has "less than premium ingredients [due to the] presence of sucralose and acesulfame potassium."[40]  The term "premium," however, is mere puffery; it has no concrete, discernable meaning in the diet soda context, and thus cannot give rise to a breach of warranty claim.  The Ninth Circuit has held that "generalized, vague and unspecific assertions constitut[e] mere 'puffery' upon which a reasonable consumer [cannot] rely."  *Glen Holly Entertainment, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1015 (9th Cir. 2003) (holding that a company's statements "generally describing the 'high priority' [it] placed on product development and alluding to marketing efforts" that suggested the product was almost complete and would be released could not form the basis for a fraud or negligent misrepresentation claim); see also *Shroyer v. New Cingular Wireless Services, Inc.*, 622 F.3d 1035, 1043 (9th Cir. 2010) ("The first count was properly dismissed because it is mere commercial 'puffery' upon which a reasonable consumer could not rely.  '[A]ll the advantages that only the nation's largest wireless

---

[40]*Id.*, ¶ 53.

company can provide' is a vague statement and provides nothing concrete upon which Shroyer could reasonably rely" (citation omitted)); *Castaneda v. Fila USA, Inc.*, No. 11–CV–1033–H, 2011 WL 7719013, *4 (S.D. Cal. Aug. 10, 2011)  ("[S]tatements [which] are non-actionable puffery . . . do not constitute an express warranty"); *Sanders v. Apple Inc.*, 672 F.Supp.2d 978, 987 (N.D. Cal. 2009) ("Statements constituting 'mere puffery' cannot support liability under a claim for breach of warranty").

   "The common theme that seems to run through cases considering puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions. Advertising which merely states in general terms that one product is superior is not actionable. However, misdescriptions of specific or absolute characteristics of a product are actionable." *Paduano v. American Honda Motor Co., Inc.*, 169 Cal.App.4th 1453, 1500 (2009) (quoting *Cook, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246 (9th Cir. 1990) (internal quotations omitted)).  For example, "an advertiser's statement that its lamps were 'far brighter than any lamp ever before offered for home movies' was ruled puffery.  However, when the advertiser quantified numerically the alleged superior brightness with statements such as '35,000 candle power and 10-hour life,'" its statements became actionable assertions of fact. *Cook*, 911 F.2d at 246 (citing *Smith-Victor Corp. v. Sylvania Electric Products, Inc.*, 242 F. Supp. 302, 308-09 (N.D. Ill. 1965)).

   Hansen's use of "premium" is general and lacks any context indicating the scope of what is being warranted; the label does even not say the beverage contains "premium flavors" or "premium ingredients."  Thus, describing a soda as "premium" is mere puffery and cannot provide the basis for an express warranty claim. See *Anderson v. Bungee Intern. Mfg. Corp.*, 44 F.Supp.2d 534 (S.D.N.Y. 1999) (statement that a product was of "premium quality," which appeared on a package of stretchable cords, was mere puffery and did not constitute an express warranty); see also *Johnson v. Mitsubishi Digital Elec. Am., Inc.*, 578 F.Supp.2d 1229, 1238–39 (C.D. Cal. 2008) (a television manufacturer's "promise to deliver unsurpassed picture quality" was mere puffery and not an actionable warranty); *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal.App.4th 1351, 1361 (2003) (a satellite broadcaster's assertion that it provided

"crystal clear digital" video quality was puffery and not actionable as a warranty).[41]   Accordingly, to the extent based on Hansen's statement that the soda was "premium" Viggiano's breach of express warranty must be dismissed.[42]

### 2.   Breach of the Implied Warranty of Merchantability and Implied Warranty of Fitness for a Particular Purpose

"Unless excluded or modified [ ], a warranty that goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  CAL. COMM. CODE § 2314(1).  Unlike express warranties, which are contractual in nature, the implied warranty of merchantability arises by operation of law.  Unless specific disclaimer methods are employed, an implied warranty of merchantability arises and accompanies every retail sale of consumer goods.  See *Steiny & Co., Inc. v. California Electric Supply Co.*, 79 Cal.App.4th 285, 295 (2000) ("The Code imposes warranties of merchantability by operation of law absent contractual modification or disclaimer").  "Consequently, [a] defendant['s] liability for an implied warranty does not depend upon any specific conduct or promise on [its] part, but instead turns upon whether the[ ] product is merchantable under the code."  *Hauter v. Zogarts*, 14 Cal.3d 104, 117 (1975).

---

[41]Even if the court concluded that "premium" constituted an express warranty, Viggiano alleges no facts supporting his conclusory assertion that the soda was not "premium" because Hansen used sucralose and ace-k to sweeten it and/or enhance its flavor.

[42]Plaintiff argues in his opposition that even if "premium" amounts to mere puffery in isolation, when coupled with the "all natural flavors" label, it amounts to an actionable warranty. As support, he cites *Williams*, 552 F.3d at 939 n. 3, where the court noted in dicta that a statement that a food is "nutritious" may be puffery, but read in the context of the entire package, it might give consumers a misleading impression of the food.  In *Williams*, however, the court concluded that other statements on the package were potentially actionable – i.e., a statement that "Fruit Juice Snacks was made with 'fruit juice and other all natural ingredients'. . . , which appear[ed] to be false."  *Id*. at 939.  Here, as noted, Hansen's diet soda packaging and can do not contain other actionable statements, such that "premium" forms part of an overall warranty regarding the quality of the product.  Moreover, the term "nutritious," applied to food products, is better defined than "premium."  "Premium" could be used, *inter alia*, to describe a food's flavor, its ingredients, its nutritiousness, or its cost.  Conversely, the term "nutritious" clearly describes the healthfulness of the food.  *Williams* is therefore inapposite.

1   The Commercial Code does not "impose a general requirement that goods precisely fulfill
2   the expectation of the buyer. Instead, it provides for a minimum level of quality." *Id.*  A plaintiff
3   who claims a breach of the implied warranty of merchantability must show that the product "did
4   not possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*,
5   114 Cal.App.4th 402, 406 (2003) (citing CAL. COMM. CODE § 2314(2)); see also *Pisano v.*
6   *American Leasing*, 146 Cal.App.3d 194, 198 (1983) ("Crucial to the inquiry is whether the
7   product conformed to the standard performance of like products used in the trade").

8   In addition to an implied warranty of merchantability, the Commercial Code imposes an
9   implied warranty of fitness for a particular purpose.  "Where the seller at the time of contracting
10   has reason to know any particular purpose for which the goods are required and that the buyer is
11   relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded
12   or modified under [§ 2316] an implied warranty that the goods shall be fit for such purpose."
13   CAL. COMM. CODE § 2315.  "A 'particular purpose' differs from the ordinary purpose for which
14   the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature
15   of his business whereas the ordinary purposes for which goods are used are those envisaged in the
16   concept of merchantability and go to uses which are customarily made of the goods in question."
17   *Mills v. Forestex Co.*, 108 Cal.App.4th 625, 635 n. 4 (2003) (quotations and citations omitted).
18   The implied warranty of fitness "is breached if the seller's product is not in fact suitable for the
19   use intended by the purchaser."  *Odell v. Frueh*, 146 Cal.App.2d 504, 508 (1956).

20   Viggiano does not allege that Hansen's diet soda lacks "even the most basic degree of
21   fitness for ordinary use"; nor does he allege that the drink is not suitable for use as a diet soda.
22   Rather, he appears to misapprehend the nature of implied warranty claims; he pleads only that
23   Hansen has breached implied warranties by representing that the drink is a "premium" diet soda,
24   containing "all natural flavors."[43]  These allegations are more suited to a breach of express
25   warranty claim, as they are specific representations made by the product manufacturer rather than
26   characteristics that affect the product's merchantability or fitness for a particular purpose.

27   _____

28   [43]FAC, ¶¶ 57, 126.

24

Viggiano does not allege any facts suggesting that the soda is not merchantable or fit for use as a diet soft drink; he has not, for example, alleged that the beverage was not drinkable, that it was contaminated or contained foreign objects, etc.  Compare *Chateau des Charmes Wines Ltd. v. Sabate USA, Inc.*, No. C-01-4203 MMC, 2005 WL 1528703, *1 (N.D. Cal. June 29, 2005) (alleging in support of a breach of implied warranty claim that "the corks damaged the smell, character and drinkability of Chateau des Charmes' wines"); *Medeiros v. Coca-Cola Bottling Co. of Turlock*, 57 Cal.App.2d 707, 711 (1943) (an allegation that, "by reason of the plaintiff drinking a portion of the contents of said bottle as aforesaid he became violently ill and was rendered sick, sore and disabled," was sufficient to state a breach of implied warranty claim against Coca-Cola's bottling company).

Viggiano has therefore failed to state claims for breach of the implied warranties of merchantability and fitness for a particular purpose, and Hansen's motion to dismiss the claims must be granted.

### 3.    Magnuson-Moss Warranty Act

The Magnuson-Moss Warranty Act ("MMWA") permits a "consumer" to sue for damage caused "by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this [act], or under a written warranty, implied warranty, or service contract." 15 U.S.C. § 2310(d)(1).  As used in the MMWA, the term implied warranty "means an implied warranty arising under State law . . . in connection with the sale by a supplier of a consumer product." 15 U.S.C. § 2301(7); *Barabino v. Dan Gamel, Inc* ., No. 2:04-cv-2359-MCE-PA, 2006 WL 2083257, *4 (E.D. Cal. July 25, 2006) ("[W]hile the Plaintiff's MMWA claim constitutes a separate federal cause of action for breach of an implied warranty, courts must look to the relevant state law to determine the meaning and creation of any implied warranty"); see also *Kanter v. Warner-Lambert Co.*, 99 Cal.App.4th 780, 798 (2002) ("State law applies in breach of warranty actions as to both implied and written warranty claims under Magnuson-Moss, except as expressly stated by that act").

Viggiano alleges that Hansen breached a written warranty by failing to provide a

"premium" diet soda containing "all natural flavors."[44]  This claim fails for several reasons. First, Viggiano has failed to plead an adequate state law breach of warranty claim; as MMWA requires that the court look to state law to determine the scope of warranties recognized, this necessarily means that he has failed to state a claim under the MMWA as well.  *Stearns v. Select Comfort Retail Corp.*, No. 08–2746 JF, 2009 WL 1635931, *9 (N.D. Cal. June 5, 2009) (the MMWA "does not expand the rights under [state law warranty] claims, and dismissal of the state law claims requires the same disposition with respect to an associated MMWA claim"). Furthermore, the MMWA is "inapplicable to any written warranty the making or content of which is otherwise governed by Federal law." 15 U.S.C. § 2311(d).  As discussed, the FDCA, and the regulations promulgated thereunder, govern food labeling requirements generally, and the use of "all natural flavors" specifically.  Accordingly, the content of Hansen's label cannot form the basis of an MMWA claim.  See *Hairston*, 2012 WL 1893818 at *5 (dismissing an MMWA claim because "the FDCA and FDA labeling regulations govern the Lifewater labeling challenged by Plaintiff");  *Kanter*, 99 Cal.App.4th at 797 (holding that the MMWA did not apply because, among other reasons, "the FDCA and its implementing regulations govern the labeling at issue").

Finally, the MMWA narrowly defines the meaning of "written warranty."  The statute states that the term means

"(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or *promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or*

(B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise, or undertaking

---

[44]FAC, ¶ 135.

becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product." 15 U.S.C. § 2301(6) (emphasis added).

The statement that Hansen's diet soda is "premium" and contains "all natural flavors" is not an assertion that the product is defect free or that it will meet a specific level of performance over a specified period of time. Nor is it a promise to take any remedial action. Rather, it is merely a description of the product. Courts have declined to extend the term "written warranty" beyond its statutory definition to cover claims such as this. See *Anderson v. Jamba Juice Co.*, 888 F.Supp.2d 1000, 1004 (N.D. Cal. 2012) ("District Courts have held consistently that labeling a product 'All Natural' is not a 'written warranty' under the MMWA. . . . The statement 'All Natural' is a general product description rather than a promise that the product is defect free"); *Hairston*, 2012 WL 1893818 at *6 ("[T]he Lifewater label fails to meet the definition of 'written warranty' under Section 2301(6)(A) of the MMWA because the label neither promises a defect-free product, nor guarantees a level of performance over a specific time period. The challenged statements – 'all natural with vitamins' and the names of various Lifewater flavors – are 'product descriptions' rather than promises that Lifewater is defect-free, or guarantees of specific performance levels"); *Astiana*, 2012 WL 2990766 at *3-4 (stating that a claim that a food product was "natural" described the product but did not assure a consumer the product was defect free, and noting that "[p]laintiffs do not cite any authority to support their position that food that contains artificial and/or synthetic ingredients is defective. Nor could the Court find any cases holding such").[45]   Therefore, Hansen's use of "premium" and "all natural flavors" on its

---

[45]Even if the court were to construe "premium" as a guarantee of a specific level of performance, the MMWA would still be inapplicable, as the guarantee does not reference a "specified period of time" and is thus not a "written warranty" as defined by the statute. See 16 C.F.R. § 700.3(a) (the MMWA "provides that a written affirmation of fact or a written promise of a specified level of performance must relate to a specified period of time in order to be considered a 'written warranty.' A product information disclosure without a specified time period to which the disclosure relates is therefore not a written warranty"); *Kelley v. Microsoft Corp.*, No. C07-0475MJP, 2007 WL 2600841, *5 (W.D. Wash. Sept. 10, 2007) (dismissing an MMWA claim because the "Windows Vista Capable" label at issue lacked the "temporal element" required

1   packaging and soda cans do not create a written warranty within the meaning of the MMWA.

2   Viggiano's MMWA claim is therefore dismissed.

3

4                               **III.  CONCLUSION**

5          For the reasons stated, the court grants Hansen's motion to dismiss without prejudice.

6   Because it is possible that Viggiano can replead his claims to avoid preemption and state a

7   plausible claim for relief by identifying artificial *flavors*, rather than artificial ingredients, that

8   Hansen's soda contains, or by identifying inconsistencies between the "all natural flavors" label

9   and the ingredients list, the court dismisses the complaint without prejudice.  Viggiano may file

10  an amended complaint within twenty days of the date of this order if he can do so consistent with

11  Rule 11.  Any amended complaint filed may not plead new claims; if Viggiano wishes to plead

12  new claims, he must obtain a stipulation from Hansen or an order from the court.

13

14  DATED: May 13, 2013

                                    _____

15                                        MARGARET M. MORROW
                                    UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26  _____

27  to constitute a warranty); *Skelton v. General Motors Corp.*, 660 F.2d 311, 316 n. 7 (7th Cir.1981)
    ("A product information disclosure without a specified time period to which the disclosure relates
28  is . . . not a written warranty").